## IN THE UNITED STATES DISTRICT COURT FOR THE
## NOTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|                              |     |                        |
| ---------------------------- | --- | ---------------------- |
| **VANESSA COLLIER,**         | )   |                        |
|                              | )   |                        |
| **Claimant,**                | )   |                        |
|                              | )   |                        |
| **v.**                       | )   | **CIVIL ACTION NO.**   |
|                              | )   | **2:18-CV-1073-KOB**   |
| **ANDREW SAUL,**             | )   |                        |
| **ACTING COMMISSIONER OF**   | )   |                        |
| **SOCIAL SECURITY,**         | )   |                        |
|                              | )   |                        |
| **Respondent.**              | )   |                        |
|                              | )   |                        |

## MEMORANDUM OPINION

## I. INTRODUCTION

On May 25, 2016, the claimant, Vanessa Collier, protectively applied for disability and disability insurance benefits under Titles II and XVI of the Social Security Act. (R. 60). The claimant initially alleged disability commencing on December 1, 2004 because of multiple sclerosis, fibromyalgia, back problems, celiac disease, varicose veins, swelling of her hands and feet, numbness in her hands and feet, and a ruptured disc in her neck. (R. 60). The claimant later amended her alleged onset date to April 30, 2015. (R. 40). The Commissioner denied the claim on September 9, 2016. (R. 96). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on November 6, 2017. (R. 37).

In a decision dated January 24, 2018, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was, therefore, ineligible for social security benefits. (R. 24). On May 16, 2018, the Appeals Council denied the claimant's request for review. Consequently, the ALJ's decision became the final decision of the Commissioner of the Social

Security Administration. (R. 1-3). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court reverses and remands the decision of the Commissioner to the ALJ for reconsideration.

## II. ISSUES PRESENTED

Whether the ALJ erred in evaluating the claimant's allegations of pain and other limiting effects of her symptoms under the Eleventh Circuit's pain standard

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the

Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant presented "'evidence of an underlying medical condition' and either 'objective medical evidence that confirms the severity of the alleged pain [or other subjective symptoms] arising from that condition' or 'that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain [or other subjective symptoms].'" *Taylor v. Acting Comm'r of Soc. Sec. Admin.*, No. 18-11978, 2019 WL 581548, at *2 (11th Cir. Feb. 13, 2019) (quoting *Dyer*, 395 F.3d at 1210); *see also* 20 C.F.R. § 404.1529; SSR 16-3p.[1] When evaluating a claimant's subjective symptoms, the ALJ considers

---

[1] Because this claim was determined after March 28, 2016, SSR 16-3p applies.

all available evidence, including objective medical evidence; the claimant's daily activities; the type, dosage, and effectiveness of medications taken to alleviate the symptoms; and factors that precipitate and aggravate the symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p. "Subjective pain testimony that is supported by objective medical evidence of a condition that can reasonably be expected to produce the symptoms of which the claimant complains is itself sufficient to sustain a finding of disability." *Taylor v. Colvin*, No. 2:15-CV-1925-VEH, 2016 WL 6610442, at *4 (N.D. Ala. Nov. 9, 2016) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). And the claimant's statements about intensity, persistence, or limiting effects of symptoms will not be rejected solely because objective medical evidence does not substantiate those statements. 20 C.F.R. § 416.929(c)(2); SSR 16-3p.

If the ALJ decides to discredit the claimant's testimony as to her pain, he must "'clearly articulate explicit and adequate reasons' for doing so." *Taylor*, 2019 WL 581548, at *2 (quoting *Dyer*, 395 F.3d at 1210). The ALJ's failure to articulate reasons for discrediting the claimant's testimony is reversible error. *Ellis v. Soc. Sec. Admin., Comm'r*, No. 4:18-cv-00010-SGC, 2019 WL 1776805, at *5 (N.D. Ala. Apr. 23, 2019).

Also, substantial evidence must support the ALJ's findings regarding the limiting effects of the claimant's symptoms. *Meehan v. Comm'r of Soc. Sec.*, No. 18-14924, 2019 WL 2417642, at *3 (11th Cir. Jun. 10, 2019); *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987). Therefore, the ALJ's determination must contain explicit reasons for the weight given to a claimant's individual symptoms, be consistent with and supported by the evidence, and be clearly articulated so the claimant and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms. SSR 16-3p. A reviewing court will not disturb a clearly articulated credibility finding that has supporting substantial evidence in the record. *Rose v. Berryhill*, No.

6:18-cv-00030-LCB, 2019 WL 2514936, at *9 (N.D. Ala. Jun. 18, 2019) (citing *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995).

## V. FACTS

The claimant was fifty-six years old at the time of the ALJ's final decision. The claimant has a high school education and past relevant work as a housekeeper and waitress/cashier. The claimant alleges disability based on multiple sclerosis, fibromyalgia, back problems, celiac disease, varicose veins, swelling of legs and feet, numbness in her hands and legs, and a ruptured disc in her neck. (R. 24, 45-46, 60).

*Physical Impairments*

In December of 2009, the claimant first saw Dr. Elson at the Kirklin Clinic as a consultation for her celiac disease that had been diagnosed in September 2009. Dr. Elson noted that the claimant complained of constant pain in her abdomen, intermittent nausea and vomiting, and alternating days of diarrhea and constipation. The claimant reported that she had "been trying very hard to stay on a gluten-free diet" to alleviate her celiac disease symptoms but felt as though the gluten-free diet had worsened her pain, constipation, and diarrhea. Dr. Elson determined that a repeat colonoscopy with biopsies was appropriate given the severity of the claimant's symptoms despite her gluten-free diet; the colonoscopy showed normal results. (R. 257-58, 260).

On June 23, 2010, the claimant saw Dr. Brockington at the Kirklin Clinic after an initial evaluation of her paresthesias in May 2010, which resulted in a diagnosis of underlying peripheral neuropathy because of her celiac disease. The claimant reported pain at a level of seven out of ten. Her physical exam indicated a marked loss of vibratory sensation in her upper and lower extremities, decreased deep tendon reflexes, mild weakness in her hand grips, and

subtle atrophy of her thenar muscle regions. On July 12, 2010, doctors at the University of Alabama at Birmingham admitted the claimant for an IVIG infusion to alleviate her peripheral neuropathy symptoms; however, the claimant reported the IVIG did not improve her symptoms. (R. 262, 265, 268).

On July 30, 2012, the claimant saw Dr. Brockington again because her balance had not improved and she could not work because of risk of falling and injury. Additionally, the claimant stated that her celiac disease had not improved despite her strict adherence to a gluten-free diet. Dr. Brockington noted that the claimant's gait was ataxic and she could not tandem walk. On October 19, 2013, Dr. Brockington wrote a letter "To Whom It May Concern" stating that the claimant's neurological symptoms of peripheral neuropathy had persisted despite treatment and consequently resulted in significant impairments including pain, weakness, and impaired balance. In this letter, Dr. Brockington stated that he believed the claimant qualified for long term disability. (R. 254, 268-69).

The claimant returned to Dr. Brockington on May 15, 2014 with complaints of limb pain and paresthesia. Dr. Brockington noted that the claimant's paresthesia worsened with increased activity and affected the claimant's balance. Dr. Brockington also noted the claimant's joint pain, muscle pain, decreased range of motion, abnormal balance, numbness, and tingling. Dr. Brockington then diagnosed the claimant with unspecified idiopathic peripheral neuropathy. (R. 275-77).

From January 2015 to October 2017, the claimant regularly visited Dr. Wiley Livingston at the Medical West Bessemer Clinic for treatment of her impairments. On January 8, 2015, Dr. Livingston noted the claimant had a history of multiple sclerosis, fibromyalgia, and celiac disease, and the claimant described symptoms of back pain, joint pain, joint stiffness, muscle

aches, and sleep disturbances. The physical examination of the claimant was normal except mild diffuse tenderness of her abdomen. Dr. Livingston also mentioned that the claimant took Percocet and received epidural blocks for pain. (R. 328, 330-31).

On April 30, 2015, the claimant visited Dr. Livingston with complaints of chronic pain "all over," numbness in her hands and feet, sleep disturbances, depressed mood, and anxiety. The physical examination of the claimant was normal. Dr. Livingston renewed the claimant's prescription for Percocet and increased her Cymbalta dose. Two months later, the claimant visited Dr. Livingston with complaints of pain in both of her legs because of her varicose veins, which had been occurring constantly for two weeks. The claimant rated her pain at a level of nine out of ten. Although the claimant lacked tenderness of her skin upon examination, Dr. Livingston still recommended the claimant wear support stockings. The claimant's physical examination was normal, but the doctor did not examine the claimant's extremities, back, or spine. Dr. Livingston renewed the claimant's prescription for Percocet. (R. 308, 310-11, 313, 315-17).

Approximately a month later, on August 6, 2015, the claimant again sought treatment from Dr. Livingston with complaints of neck pain and back pain that radiated down her right leg. The claimant had received a cervical epidural block in June 2015 at Brookwood Medical Center, but the block only "helped some." Dr. Livingston noted that the claimant had to push her husband's wheelchair, which aggravated her symptoms, but the claimant's physical examination was normal. Consequently, Dr. Livingston injected the claimant's sacroiliac joints with 120 milligrams of depo-medrol to decrease her inflammation and prescribed alendronate to treat her osteoporosis. Additionally, Dr. Livingston continued to prescribe Percocet for the claimant. (R. 302, 304-06).

After a previous visit on October 27, 2015 to see Dr. Livingston for problems related to her gastrointestinal issues, the claimant saw Dr. Livingston on November 23, 2015 with complaints of tailbone pain after falling down her steps six days prior. The physical examination only reviewed the claimant's vital signs, but Dr. Livingston noted she moved stiffly and diagnosed her with sacral back pain. Dr. Livingston continued to prescribe Percocet for the claimant. (R. 292-295).

Months later on May 23, 2016, the claimant visited Dr. Livingston with complaints of aching, burning sharp pain and tenderness of her left breast which started a month prior, occurred three to four times a day, and lasted anywhere from thirty minutes to three to four hours. Likewise, the claimant reported that she has had multiple breakdowns since her husband's death on May 1, 2016, coupled with panic attacks, anxiety, trouble sleeping, and blood in her stool. The physical examination was normal except tenderness with palpation of the claimant's left breast, but no examination was conducted of the claimant's neck, back, spine, or extremities. Dr. Livingston continued to prescribe Percocet for the claimant. (R. 281-86).

On June 23, 2016, the claimant completed a function report. In this self-assessment, the claimant indicated that she had trouble buttoning her clothes and eating with silverware, often dropped things while caring for her hair, had to sit down in the shower, and used the bathroom on herself because of her celiac disease. The claimant reported that she simply stayed in bed and pulled the covers over her head if she woke up in pain. (R. 211-218).

The claimant reported that she was able to do her chores, but it took her "forever." For instance, the claimant indicated that it takes her three days to cut her lawn and a day to do laundry. The claimant reported that she had two dogs that she cared for and fed. The claimant stated that she was able to drive, but she only left her home on days she "fe[lt] like it" and only

to get groceries and dog food. The claimant specified that she tried to do all her shopping in one trip because her hands and feet were so numb that she could not feel anything. (R. 212-14).

Additionally, the claimant indicated that her social activities only included talking on the phone. The claimant stated that she did not go anywhere on a regular basis as staying in bed made her feel better. She reported that she did not have energy, and her hobbies included watching television instead of walking because she was unable to walk anymore. The claimant also indicated that she had trouble squatting, bending, standing, reaching, walking, sitting, lifting more than five pounds, kneeling, stair climbing, seeing, and using her hands. (R. 215-16).

On August 16, 2016, the claimant saw Dr. Abiodun Badewa at the request of the Disability Determination Service. Dr. Badewa found that the claimant had decreased range of motion, extension, and flexion in her cervical spine and dorsolumbar spine. Dr. Badewa also noted a decreased flexion and extension of the claimant's knees and a decreased flexion of her ankles. Likewise, Dr. Badewa found a decreased abduction, forward elevation, and rotation of the claimant's shoulders. Dr. Badewa indicated that the claimant had an abnormal gait and limped. (R. 336-338, 342).

Dr. Badewa found that the claimant presented issues with aching, sharp, chronic back pain located on her thoracic spine and lumbar-sacral spine, and he noted the claimant's complaint started eighteen years ago, moderately limited her activities, and was connected to her degenerative disc disease. Dr. Badewa also indicated that standing exacerbated the claimant's symptom but Percocet alleviated this symptom. Dr. Badewa found that the claimant presented issues with neck pain located in her cervical spine, which started eighteen years ago, moderately limited her activities, and stemmed from her arthritis. Her neck pain was described as "aching,

chronic, sharp, squeezing, stabbing, knife-like, and numbness." Dr. Badewa noted that Percocet alleviated this symptom. (R. 342).

Dr. Badewa also found that the claimant presented issues with paresthesia located on both hands and legs. The paresthesia was "described as chronic, numbness and pins and needles." Dr. Badewa noted the symptom started nine years prior and related to the claimant's celiac disease diagnosed in 2007. Dr. Badewa found that the claimant had issues with chronic, stable venous thrombosis relating to her varicose veins in a superficial vein of the distal left leg. Finally, Dr. Badewa indicated the claimant presented issues with chronic, intermittent spasms relating to her multiple sclerosis that doctors diagnosed in 2004. Dr. Badewa noted the symptom began eleven years ago and moderately limited her activities. (R. 342).

On August 29, 2016, the claimant saw Dr. Cynthia Neville, a licensed clinical psychologist, at the request of the Social Security Administration for a consultative mental examination. The claimant disclosed to Dr. Neville that Vistaril was prescribed to her "just for 3 months" following the death of her husband in May of 2016, but it was not helpful; however, Cymbalta helped to calm her down. Additionally, the claimant noted that Lunesta was prescribed to her, and it "was helping her sleep, but not now." The claimant then stated that she cried often, did not sleep, and crawled back into bed to deal with her symptoms. The claimant attributed her feelings of depression and anxiety to her recent loss of her husband and her worries and difficulty coping with her reported illnesses. The claimant also told Dr. Neville that she saw friends "every other day," attended church twice a month, and dropped off food for her elderly neighbors on occasion. (R. 358-59, 361).

Generally, Dr. Neville found the claimant's affect to be broad and her mood to be mildly dysphoric at times but primarily euthymic. Dr. Neville noted that the claimant's gait was a bit

awkward, but Dr. Neville also noted that the claimant did not rely on an assistive device. Dr. Neville indicated that the claimant was oriented in all spheres, had a sufficient memory, calculated simple math problems correctly, and had no loose associations, tangential thinking, confusion, signs of psychosis, or abnormalities that might interfere with normal communication. (R. 360-61).

Dr. Neville diagnosed the claimant with mild somatic symptom disorder and uncomplicated bereavement. Dr. Neville noted that the claimant's symptoms of bereavement might improve over time but her symptoms of somatic symptom disorder were unlikely to improve significantly over the next twelve months. Likewise, Dr. Neville indicated that the claimant possessed the cognitive abilities to understand and remember work instructions but found that the claimant's ability to follow through and handle typical work pressures might be limited to a mild degree by her symptoms of bereavement and somatic system disorder. (R. 361).

At the request of the Social Security Administration on September 9, 2016, Dr. Robert Estock reviewed medical records from Dr. Badewa, Dr. Neville, Dr. Brockington, and Dr. Livingston and the claimant's submitted evidence, such as her work history and function report. Dr. Estock indicated that the claimant suffered from severe fibromyalgia, osteoarthrosis and allied disorders, disorders of her gastrointestinal system, multiple sclerosis, peripheral neuropathy; likewise noted that the claimant suffered from non-severe varicose veins of her lower extremities, somatoform disorders, and affective disorders. (R. 58, 60-66).

He found that the claimant's affective disorders and somatoform disorders presented only mild limitations on her daily living activities and mild difficulties in maintaining social functioning, concentration, persistence, and pace. Dr. Estock determined the claimant could occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand about six hours

in an eight hour workday; sit about six hours in an eight hour workday; frequently climb stairs, stoop, kneel, balance, crouch and crawl; but never climb a ladder or rope. Also, Dr. Estock noted that the claimant should avoid concentrated exposure to extreme cold or heat and was limited in her ability to push or pull with both her upper and lower extremities. (R. 60-66, 69-70).

By October 11, 2016, the claimant denied back, joint, and muscle pain and joint stiffness to Dr. Livingston. The claimant's physical examination was normal. On this date, Dr. Livingston wrote a letter expressing that he found the claimant "totally disabled" because of her back pain and other chronic issues. Dr. Livingston continued to prescribe Percocet for the claimant. (R. 375-77, 363).

In early 2017, the claimant's old issues returned, and she reported symptoms of back pain, hip pain, joint pain, joint stiffness, and sleep disturbances. The claimant's physical examination was normal, but Dr. Livingston only reviewed her vital signs and heart to make this determination. Dr. Livingston continued to prescribe Percocet for the claimant. (R. 369-372).

On May 23, 2017, the claimant visited Dr. Livingston with complaints of back pain following her fall on May 5th while cutting her grass. The claimant's physical examination was normal, but Dr. Livingston only reviewed her vital signs to make this determination. Dr. Livingston prescribed twenty milligrams of prednisone once a day and decreased the claimant's prescription of Percocet from ten milligrams twice a day to seven and a half milligrams twice a day. (R. 384, 386).

On October 18, 2017, the claimant saw Dr. Livingston for a follow-up visit and reported another recent fall that caused bruises on her arms. The claimant also reported back pain, but her physical exam appeared normal. Dr. Livingston continued to prescribe Percocet for the claimant. (R.389, 391-393).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability benefits, the claimant requested and received a hearing before an ALJ. At the hearing, the claimant testified that her last job was as a housecleaner, and before she cleaned houses, she worked as a waitress and would run the register. She stated that she would regularly lift or carry twenty-five pounds as a housecleaner and lift or carry ten pounds or more as a waitress. The claimant testified that she last worked in 1998 because her husband wanted her to stay home and raise their son. (R. 37, 45-46).

The claimant stated that she has numbness in her hands and feet, cannot stand up, and falls, all of which prevent her from working. She has had numbness in her hands and feet all her life, but the symptoms have gotten worse with time. The claimant also stated she has other symptoms including celiac disease, so she often cannot go to the bathroom. She is constantly in pain, mostly in her legs and hands. (R. 41-42, 44-45).

The claimant's legs and ankles exhibit the worst pain and symptoms because they often swell every day. The swelling usually does not subside, but if she props them up above her heart for at least thirty minutes, the swelling would "go down some." Her "ankles stay real huge" even after propping them up. To help relieve her pain, the claimant sits on a heating pad or takes a warm bath. (R. 44, 48-49).

Regarding how her symptoms affect her ability to function on a daily basis, the claimant testified that she cannot pick things up or do things that she used to do. She can stand for a maximum of ten minutes, sit for approximately thirty minutes at a time, walk half a block before she has to sit down, and carry only five pounds. Additionally, the claimant testified that she can only stand for a total of an hour between eight o'clock in the morning to five o'clock in the

afternoon and typically spends the rest of the day lying down. She has used a cane, which was prescribed by Dr. Livingston, over the past two years to help her when she is ambulating. Besides her cane, the claimant testified that she used other assistive devices at home such as "pull-its" and a shower chair. (R. 42-43, 47).

The claimant stated that Dr. Williamson has treated her for the past five years. The claimant testified that she does not smoke, use tobacco products, or drink alcohol. She was last hospitalized in 2010 for an IVIG treatment, which aimed to alleviate her weakness and numbness; she stated the treatment did not work. Likewise, the claimant testified that rainy days aggravate her pain and numbness. (R. 44, 47, 49).

The claimant stated that she has not tried to work since her last occupation. Also, the claimant testified that she had no source of income or healthcare insurance and lived in a mobile home by herself. She usually wakes up at five in the morning and has a cup of coffee. However, she would then have to get back in bed because she is "hurting so bad." The claimant stated that she would try to do some housework, but she has trouble doing chores because she has a hard time moving. The claimant also stated that she can drive sometimes, but in a typical week, she testified that she only drives "to the grocery store and back because [she] just can't go anywhere." (R. 43-44, 46-48).

A vocational expert, Ms. Renee Smith, testified concerning the type and availability of jobs that the claimant was able to perform. Ms. Smith characterized the claimant's past relevant work as a housekeeper as medium, semi-skilled work. Additionally, Ms. Smith testified that the claimant's past relevant work as a waitress/cashier was light, semi-skilled work. In general, Ms. Smith stated that the claimant does not possess transferable skills. (R. 49-50).

The ALJ asked Ms. Smith to assume an individual of advanced age, with a high school education, who needed a temperature-controlled environment; could perform medium work; could occasionally stoop and crouch; could not climb; could not push or pull with lower extremities; and could not walk on uneven terrain. When considering these limitations, Ms. Smith stated that the individual could work as a ball sorter, which has greater than 125,000 jobs available nationally and 1,200 jobs available in Alabama; as a patient transport, which has approximately 100,000 jobs available nationally and 1,200 jobs available in Alabama; and as a crate liner, which has greater than 300,000 jobs available nationally and 4,000 jobs available in Alabama. When considering these limitations for a light-work job, Ms. Smith testified that the claimant could work as a block inspector, which has greater than 200,000 jobs nationally and 3,000 in Alabama; as a marker, which has around 800,000 jobs available nationally and 6,000 in Alabama; and as a rag inspector, which has greater than 200,000 jobs nationally and 3,000 in Alabama. Ms. Smith also testified that the claimant could return to her previous jobs as a housekeeper and waitress/cashier. (R. 50-52).

The ALJ then added the additional limitation that the claimant could only stand or walk for ten minutes at a time. With this limitation, Ms. Smith testified that the claimant could not perform either of her past relevant jobs or any other previously mentioned medium work identified by Ms. Smith. However, Ms. Smith testified that the claimant could perform the light work options previously identified, but the number of jobs available in the market would have to be reduced by thirty percent. (R. 52-53).

The ALJ added the additional limitation that the claimant has to elevate her legs at heart level for thirty minutes during the work day. Ms. Smith testified that this limitation would not affect her employability if the claimant could elevate her legs during normally-scheduled breaks.

But if the claimant elevated her legs outside the normally-scheduled breaks, Ms. Smith stated that the claimant would not be able to perform any of her previous jobs or the jobs previously identified. Additionally, Ms. Smith stated that an individual is only permitted to be off-task for up to fifteen percent of the work day, which includes one thirty-minute break and two fifteen-minute breaks. (R. 53-54).

Ms. Smith testified that the claimant would be expected to be on her feet for up to two hours at a time with both light and medium work, and Ms. Smith reported that the claimant would be expected to stand for six out of the eight hours during a typical workday. Ms. Smith also testified that the claimant would be expected to miss no more than two days per month from work. (R. 55).

The ALJ then posed another limitation that the claimant would need to use a cane for balance and ambulation at work, and Ms. Smith stated that the claimant would not be able to perform her past two relevant jobs or the medium jobs identified. However, Ms. Smith stated that the claimant could perform the light work identified, but the number of jobs available in the market would be reduced by thirty percent. (R. 55-56).

*The ALJ's Decision*

On January 24, 2018, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ determined that the prescribed period for disabled widow's benefits ends on July 31, 2022. Additionally, the ALJ found that the claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act. The ALJ then stated that the claimant had not engaged in substantial gainful activity since April 30, 2015. (R. 11, 14, 17).

Next, the ALJ found that the claimant had the severe impairments of fibromyalgia, multiple sclerosis by history, peripheral neuropathy and celiac disease, all of which significantly limit her ability to perform basic work activities. The ALJ also noted that the medical records indicated a history of varicose veins, gastroesophageal reflux disease ("GERD"), Vitamin B12 deficiency, restless leg syndrome, and lumbago. However, the ALJ found that the claimant did not allege any substantial limitations resulting from these conditions, and no significant limitations were identifiable in the record. Consequently, the ALJ determined that these impairments were not severe. (R. 14-15).

On the same note, the ALJ concluded that the claimant's mental impairments of mild somatic symptom disorder, uncomplicated bereavement, anxiety, and depression, considered singly and in combination, did not cause more than minimal limitation in the claimant's ability to perform basic mental work and were, therefore, non-severe. (R. 15).

The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ first considered whether the claimant met the criteria for listing 11.09(A) concerning multiple sclerosis. The ALJ noted that the claimant's multiple sclerosis had been fairly well-controlled with medication with no documented evidence of a single relapse. Likewise, the ALJ found no evidence of any "extreme" difficulties standing up from a seated position, balancing while standing or walking, or using her upper extremities. The ALJ indicated that "Dr. Livingston's repeatedly documented essentially normal neurological examinations," which contained no evidence of decreased muscle strength, muscle atrophy, abnormal sensation, problems with balance, or difficulty transferring. The ALJ likewise

determined that the claimant's multiple sclerosis did not meet the "paragraph B" requirements of the listing. (R. 16-17).

Additionally, the ALJ determined that the claimant's fibromyalgia did not meet the requirements of any impairment in 20 CFR Part 404, Subpart P, Appendix 1, because fibromyalgia is not a listed impairment. The ALJ noted that the Social Security Ruling 12-2p states that fibromyalgia could possibly equal the requirements of other listings found in 20 CFR Part 404, Subpart P, Appendix 1, such as 14.09D, but the ALJ determined that no examining or treating medical source had stated that the claimant's fibromyalgia equaled the criteria of any listed impairment. (R. 17).

The ALJ considered the claimant's celiac disease using the criteria found in within section 5.00 of 20 CFR Part 404, Subpart P, Appendix 1, which deals with digestive system disorders. The ALJ determined that no evidence supported finding that the claimant's celiac disease would meet the criteria of the Listing. (R. 17).

Next, the ALJ determined that the claimant had the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c), such that the claimant required a temperature-controlled work environment; could occasionally stoop and crouch; could not climb or walk on uneven terrain; and could not push and/or pull with her bilateral lower extremities. (R. 17-18).

In making this finding, the ALJ considered the claimant's symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 404.1529 and 416.929, SSR 16-3p, and 20 C.F.R. 404.1527 and 416.927. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause

symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of these symptoms were not fully consistent with the evidence. Therefore, the ALJ found no reasons why the claimant would be unable to perform work falling within the scope of the residual functional capacity. The ALJ noted that the "documentary record showed that the claimant [was] still capable of cutting her lawn, caring for her dogs, caring for her personal needs, preparing simple meals, washing laundry, shopping, cleaning her home, driving a vehicle, handling her own finances, visiting with her sister, attending church, and occasionally feeding her elderly neighbors." (R. 18-21).

The ALJ also pointed to the claimant's consistently normal physical examinations by Dr. Livingston as proof of the claimant's residual functional capacity to perform medium work. Additionally, the ALJ noted that the claimant did not receive treatment for any of her disabling impairments from May 2014 to January 2015. The ALJ pointed to the fact that one of the claimant's complaints of back pain stemmed from her assistance in pushing her husband's wheelchair. The ALJ noted that Dr. Livingston found the claimant ambulated without the help of a cane and that Dr. Livingston's treatment records did not indicate that he ever prescribed the claimant a cane to use for ambulation. (R. 19- 21).

The ALJ then looked to Dr. Badewa's consultative examination of the claimant. The ALJ noted that Dr. Badewa found the claimant's physical examination to be normal except for a decrease range of motion of the claimant's cervical spine, lumbar spine, knees, and shoulders. (R. 20).

The ALJ also considered the opinion evidence of the claimant's reviewing and examining physicians. First, the ALJ noted that Drs. Estock and Neville found that the claimant's medically determinable mental health impairments did not cause any more than mild limitations in any area

of mental health functioning. Consequently, the ALJ gave the opinions of Drs. Estock and Neville great weight because he found their opinions to be consistent with the evidentiary record as a whole and uncontradicted by other objective evidence. (R. 21).

Additionally, the ALJ determined that Dr. Livingston's opinion, that the claimant is "totally disabled," should be given little weight because this determination of disability is left to the Commissioner of Social Security. The ALJ also found Dr. Livingston's opinions unsupported by his own treatment records, "which consistently document essentially normal physical examinations." However, the ALJ gave Dr. Livingston's actual findings of essentially normal physical examinations great weight. The ALJ also gave Dr. Badewa's findings great weight because they are consistent with the evidentiary record as a whole. (R. 21-22).

Finally, the ALJ found that the claimant could perform her past relevant work as a housekeeper and as a food server/cashier. In making this determination, the ALJ relied on the testimony of the vocational expert at the ALJ Hearing. By comparing the claimant's residual functional capacity to the physical and mental demands of this work, the vocational expert testified that the claimant could return to her past work as a housekeeper and a food server/ cashier. (R. 22).

Additionally, the ALJ determined that, based on the claimant's age, education, work experience, residual functional capacity, and vocational expert's testimony, jobs existed in significant numbers in the national economy that the claimant could perform. The ALJ stated that the claimant could also perform occupations such as ball sorter, patient transport, and crate liner. Therefore, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 23-24).

# VI. DISCUSSION

*The ALJ's Assessment of the Eleventh Circuit Pain Standard*

The claimant argues that the ALJ did not properly assess her credibility consistent with the Eleventh Circuit Pain Standard. More precisely, the claimant argues that substantial evidence does not support the ALJ's determinations regarding her allegations of intensity, persistence, and limiting effects of her symptoms. This court agrees.

In the present case, the ALJ determined that the claimant suffered from underlying medical impairments of fibromyalgia, multiple sclerosis, peripheral neuropathy, and celiac disease. He also explicitly stated that he discredited the claimant's subjective complaints of pain because her allegations regarding the intensity, persistence, and limiting effects of these symptoms were not consistent with her daily living activities and were undermined by Dr. Livingston's consistently normal physical examinations of the claimant. However, substantial evidence does not support either of the ALJ's reasons for discounting the claimant's statements. *See Hale*, 831 F.2d at 1012 (noting that substantial evidence must support the ALJ's findings regarding the limiting effects of the claimant's symptoms).

The ALJ's conclusion that the claimant's daily activities do not support her subjective statements about the limiting effects of her pain does not pass muster. Although the ALJ gave this specific reason for rejecting the claimant's testimony as to her pain, he failed to consider the record as a whole and consequently misconstrued the nature of the claimant's ability to do certain daily activities. While the claimant testified of many limitations to her daily activities, the ALJ merely considered the claimant's daily activities generally and failed to acknowledge any limitation associated with that daily activity. Because of this failure, the court questions whether substantial evidence supports the ALJ's conclusion about the claimant's daily activities.

The ALJ found that the claimant's ability to drive, grocery shop, cut her lawn, do laundry, and clean her home undermined her subjective statements about the limiting effects of her pain. But the ALJ *ignored* that the claimant only drove occasionally when "she felt like it" and only to get groceries and food; that she tried to do all of her shopping in one trip because her hands and feet were so numb she could not feel them; that she takes three days to cut her lawn because of her pain; and that she has "trouble" doing chores because she has a hard time moving. The claimant's ability to do these daily activities *with these limitations* does not undermine her subjective statements about her pain. The ALJ cannot simply ignore these limitations and then claim substantial evidence supports his misconstrued conclusion about the claimant's daily activities.

Moreover, the claimant's ability to do these activities with these limitations does not support the ALJ's finding that she can work a forty-hour work week. She does not have to be "bedridden" to be disabled, and her ability to do everyday activities for short periods of time in limited ways does not negate that she has debilitating pain. *See Bennett v. Barnhart*, 288 F.Supp.2d 1246, 1252 (N.D. Ala. 2003) ("[It is not] necessary for a plaintiff's pain to render her bedridden in order for her to be disabled…It is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform minor household chores or drive short distances."); *see also Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997) (finding that participation in everyday activities of short duration, such as housework or fishing, does not disqualify a claimant from disability).

Additionally, the ALJ consistently relied on Dr. Livingston's "essentially normal" physical examinations of the claimant to discredit her pain testimony, but the ALJ mischaracterized Dr. Livingston's medical opinion and findings. Dr. Livingston's physical

exams of the claimant were typically not holistic exams that documented pertinent evaluations of the claimant's neck, back, extremities, and neurological status. Instead, the claimant's physical examinations mostly consisted of reporting her vital signs and exams of her heart, lungs, head, ears, eyes, nose and throat. In fact, out of the claimant's fifteen visits to see Dr. Livingston, he only evaluated the claimant's neck seven times, back and spine four times, extremities six times, and neurological status seven times. Consequently, the court finds it unsurprising that the claimant's physical examinations were "essentially normal" because her exams mostly consisted of a review of bodily systems that were unrelated to the claimant's alleged symptoms.

Likewise, while the ALJ discredited the claimant's pain testimony partially because of Dr. Livingston's examinations, the court notes the difficulty in capturing the effects of pain in physical exams. The claimant's ability to exhibit a full range of motion of her extremities, for example, does not discount the pain or numbness she may feel in those extremities. Therefore, by relying on Dr. Livingston's "essentially normal" physical exams, the ALJ misconstrued the evidence he used to discredit the claimant's subjective pain testimony.

While the ALJ primarily relied on Dr. Livingston's "essentially normal" physical examinations of the claimant, he further mischaracterized the evidence by failing to mention other medical evidence that noted her abnormalities. For instance, Dr. Badewa, referred by the Disability Determination Service, noted in August 2016 that the claimant presented a number of pain related symptoms that moderately limited her activities and found that the claimant had an abnormal gait, decreased range of motion, and decreased flexion and extension of a number of her extremities. (R. 336-357). The ALJ mischaracterized this evidence by stating, "Except for decreased range of motion of the claimant's cervical spine, lumbar spine, knees and shoulder, her

physical examination was again essentially normal." (R. 20). This court does not find such abnormalities noted in an examination to equate to an "essentially normal" physical exam.

Likewise, despite Dr. Brockington's findings, the ALJ still stated the claimant's physical examinations were "essentially normal," but this court finds the ALJ also mischaracterized Dr. Brockington's physical examinations. (R. 19). Throughout the claimant's visits to the Kirklin Clinic in June 2010, July 2012, and May 2014, Dr. Brockington noted the claimant's decreased range of motion, abnormal balance, ataxic gait, decreased tendon reflexes, mild weakness in her hand grips, and muscle atrophy. (R. 262, 269, 276). Dr. Brockington believed the claimant's symptoms were so severe that she required long term disability because her ailments had persisted despite treatment. (R. 254); *see Lamb v. Bowen*, 847 F.2d 698 (11th Cir. 1988) ("[T]he record is replete with evidence of a medical condition that could reasonably be expected to produce the alleged pain. No examining physician ever questioned the existence of appellant's pain. They simply found themselves unable to cure the pain.").

Although the ALJ stated that he "review[ed] the evidentiary record in its entirety," the ALJ failed to consider the claimant's longitudinal treatment history with multiple doctors and, therefore, did not examine the evidence in its totality. (R. 20). For instance, the claimant has attempted to alleviate her pain symptoms since her initial visit with Dr. Elson in 2009, and she continues to seek treatment for her symptoms today. Additionally, the ALJ failed to consider or even mention the claimant's prescription for Percocet. Her treating physicians determined her symptoms to be of such severity to require narcotic pain relievers, as opposed to over-the-counter medications such as Tylenol, and Dr. Livingston prescribed the claimant Percocet for several years. Dr. Livingston has also prescribed the claimant up to fourteen medications. (R. 295); *see Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56 (11th Cir. 2010) (finding the

claimant's credibility bolstered by evidence showing she made numerous visits to her doctors, endured numerous diagnostic tests, and was prescribed numerous medications); *see also Frizzell v. Astrue*, 487 F. Supp.2d 1301, 1306-07 (N.D. Ala. 2007) (holding that a "longitudinal history of complaints and attempts at relief" supported the claimant's pain testimony, noting that her treating physician regularly prescribed pain medication and accepting the claimant's pain allegations as true).

Given the record as a whole regarding the claimant's abnormal physical exams, substantial evidence does not support the ALJ's discounting of the claimant's subjective statements about the limiting effects of her pain. Therefore, this court finds that substantial evidence does not support the ALJ's reasons for undermining the claimant's subjective pain testimony.

*Other Concern:*

This court is concerned that the ALJ failed to properly consider the opinions and medical evidence provided by Dr. Brockington contained in the record and likewise failed to accord weight to Dr. Brockington's findings or opinion. On remand, the ALJ should thoroughly discuss Dr. Brockington's opinion.

## VII: CONCLUSION

For the reasons stated above, this court concludes that the decision of the Commissioner is to be REVERSED and REMANDED.

The court will enter a separate Order in accordance with the Memorandum Opinion.

**DONE** and **ORDERED** this 6th day of September, 2019.

_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE